Docket No. 103212.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

ROSEWOOD CARE CENTER, INC., Appellee, v. CATERPILLAR, INC., Appellant.

*Opinion filed November 1, 2007.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

## OPINION

Plaintiff, Rosewood Care Center, Inc. of Peoria (Rosewood), filed an action against defendant Caterpillar, Inc., seeking reimbursement for skilled nursing care services provided to Caterpillar's employee, Betty Jo Cook, while she was a patient at Rosewood. Rosewood alleged in its complaint that Caterpillar had promised to pay for the care and treatment Rosewood provided to Cook. In response, Caterpillar moved to dismiss the complaint, arguing that the alleged promise to pay for Cook's care was not enforceable because it was not in writing as required by the Frauds Act (statute of frauds) (740 ILCS 80/1 (West 2004)). The circuit court granted Caterpillar's motion and Rosewood appealed.

The appellate court reversed and remanded. 366 Ill. App. 3d 730. Relying on *Williams v. Corbet*, 28 Ill. 262 (1862), and *Hartley Bros. v. Varner*, 88 Ill. 561 (1878), the appellate court held that a promise to pay the debt of another is subject to the statute of frauds only if the debt exists at the time the promise is made. Applying a "preexisting debt rule," the appellate court concluded that, because Caterpillar's alleged promise to pay for Cook's care was made before the debt came into existence, it was not subject to the statute of frauds and the circuit court erred in dismissing Rosewood's complaint.

We subsequently granted Caterpillar's petition for leave to appeal (210 Ill. 2d R. 315) and now affirm the judgment of the appellate court, although we do so on different grounds.


BACKGROUND

The following facts are taken from Rosewood's complaint and attached exhibits. On October 21, 2001, Cook suffered injuries at work and was hospitalized from that date until January 30, 2002. Sometime thereafter, Cook filed a workers' compensation claim against Caterpillar.

On January 3, 2002, Caterpillar contacted HSM Management Services (HSM), the management agent for Rosewood, a skilled nursing facility. Caterpillar requested that Rosewood admit Cook on a "managed care basis (fixed rate)." HSM advised Caterpillar that Rosewood would not admit Cook on those terms.

Shortly thereafter, on January 10, Dr. Norma Just, Caterpillar's employee in charge of medical care relating to workers' compensation claims, contacted HSM. Just told HSM that Cook had sustained a work-related injury and was receiving medical care at Caterpillar's expense under the workers' compensation laws. Just requested that Cook be admitted to Rosewood for skilled nursing care and therapy, and stated that the cost of Cook's care would be 100% covered and paid directly by Caterpillar to Rosewood with a zero deductible and no maximum limit. Just further advised HSM that Cook had been precertified for four weeks of care. Just asked that Rosewood send the bills for Cook's care to Caterpillar's workers' compensation division.

That same day, HSM faxed a letter to Dr. Just confirming their conversation. In this letter, HSM requested Just to acknowledge that

she had agreed to (1) a "SNF admission for Cook," (2) four weeks of treatment, and (3) the need for further evaluation in connection with the length of care Cook would require. Just signed the fax, acknowledging her agreement, and returned it the next day.[1]

On January 20, "Sue" from Dr. Just's office telephoned HSM and confirmed approval for Cook's transfer from the hospital to Rosewood. On January 30, Sue reconfirmed, via telephone, Caterpillar's authorization for Cook's care and treatment in accordance with the January 10 agreement, except that Sue now advised HSM that Cook was precertified for two weeks of care instead of the original four weeks.

On January 30, Cook was admitted to Rosewood. Upon her admission, Cook signed a document entitled "Assignment of Insurance Benefits" as required by law. In this document, Cook assigned any insurance benefits she might receive to Rosewood and acknowledged her liability for any unpaid services.

Caterpillar, through its health-care management company, continued to orally "authorize" care for Cook and did so on February 8, February 25, March 11, March 21, April 8, April 18, May 16, and June 4. Cook remained at Rosewood until June 13, 2002. The total of Rosewood's charges for Cook's care amounted to $181,857.

Rosewood billed Caterpillar on a monthly basis on February 12, March 11, April 15, May 14, June 10, and July 15. Caterpillar never objected to the bills being sent to it for Cook's care, nor did it ever advise Rosewood that treatment was not authorized. However, Caterpillar ultimately refused to pay for services rendered to Cook.

Rosewood filed an amended complaint against both Caterpillar and Cook. Relevant here, count III of Rosewood's complaint stated a claim for breach of contract against Caterpillar, count IV a claim for promissory estoppel, and count V a claim for *quantum meruit*. In connection with the promissory estoppel claim, Rosewood averred that, prior to Cook's admission, Caterpillar had, in the past, requested, authorized, and approved care and treatment at Rosewood for other injured employees and had paid for the services. Rosewood averred

---

[1]Rosewood does not contend that this letter satisfies the writing requirement of the statute of frauds.

that it only admitted Cook based on Caterpillar's promise. Rosewood further averred that it would not have admitted Cook without Caterpillar's promise to pay.

Caterpillar moved to dismiss the breach of contract count (count III) and the promissory estoppel count (count IV), pursuant to section 2–619(a)(7) of the Code of Civil Procedure (735 ILCS 5/2–619(a)(7) (West 2004)). Caterpillar argued that these claims were barred because its alleged agreement to take responsibility for the cost of Cook's care was not in writing, as required by the statute of frauds. Caterpillar also filed a motion to strike count V, the *quantum meruit* claim.

On April 4, 2005, the trial court granted Caterpillar's motion to dismiss the breach of contract and promissory estoppel counts, finding that the statute of frauds applied and, thus, barred Rosewood's claims. Thereafter, the trial court granted Caterpillar's motion to strike the *quantum meruit* count. In a subsequent order, the trial court held, pursuant to Supreme Court Rule 304(a), that there was no just reason to delay appeal of its order dismissing the breach of contract and promissory estoppel counts, as well as its order striking the *quantum meruit* count.

On appeal, the appellate court reversed and remanded. 366 Ill. App. 3d 730. Relying on *Williams v. Corbet*, 28 Ill. 262 (1862), and *Hartley Bros. v. Varner*, 88 Ill. 561 (1878), the appellate court concluded that the statute of frauds is only applicable when the promise to pay the debt of another is made after the obligation of the principal has been incurred. In other words, the debt must preexist the promise. Here, it was alleged that Caterpillar made its promise to pay Rosewood prior to the time Cook was admitted and, thus, Cook had no preexisting debt. The appellate court acknowledged that several appellate decisions seemed to be at odds with *Williams* and *Hartley Bros.,* and that the preexisting-debt rule had been abandoned by other jurisdictions and legal authorities. Nevertheless, the appellate court concluded that principles of *stare decisis* required it to follow

*Williams* and *Hartley Bros.* and found the trial court erred in dismissing Rosewood's complaint on this basis.[2]

Justice Lytton specially concurred to "discuss the general and widely recognized trend to abandon the preexisting debt requirement." 366 Ill. App. 3d at 735 (Lytton, J., specially concurring). Justice Lytton noted that Illinois' statute of frauds does not contain a preexisting-debt requirement, and concluded that the timing of the promise should not limit the statute's application. However, Justice Lytton agreed that the court was bound by *stare decisis* to apply the preexisting-debt rule. We thereafter granted Caterpillar's petition for leave to appeal (210 Ill. 2d R. 315(a)).

ANALYSIS

I. Preexisting Debt Rule

The first issue, raised by Caterpillar, is whether the appellate court erred in holding that the preexisting debt rule takes this case out of the statute of frauds. Caterpillar contends that the appellate court erred in applying the preexisting debt rule because the rule is not supported by the statutory language nor is it commensurate with the purposes underlying the statute of frauds. We agree.

The statute of frauds provides in relevant part:

"No action shall be brought *** whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person *** unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in

---

[2]With respect to Rosewood's promissory estoppel and *quantum meruit* counts, the appellate court held that the statute of frauds bars all claims at law and in equity and, thus, "[p]romissory estoppel cannot be applied to allow recovery where the statute of frauds bars the contract claim." 366 Ill. App. 3d at 735. However, because the appellate court concluded the statute of frauds does not apply in the instant case, the court held that the trial court erred in dismissing these counts as well. Before this court, Rosewood does not challenge the appellate court's holding that the statute of frauds bars all claims at law and in equity, *i.e.*, that, if applicable, the statute of frauds would bar its promissory estoppel and *quantum meruit* claims.

writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized." 740 ILCS 80/1 (West 2004).

This section of the statute is known as the surety provision (72 Am. Jur. 2d *Statute of Frauds* §4, at 536 (2001)), and has remained unchanged in all material respects since its enactment in Illinois in 1819.

When interpreting this statute, we recall that the fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *People v. Pack*, 224 Ill. 2d 144, 147 (2007). The language of the statute is the best indication of legislative intent, and we give that language its plain and ordinary meaning. *Pack*, 224 Ill. 2d at 147. We may not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 117 (2007). "[A] court should not attempt to read a statute other than in the manner in which it was written." *Ultsch v. Illinois Municipal Retirement Fund*, No. 102232, slip op. at 7 (August 2, 2007).

In general, the statute of frauds provides that a promise to pay the debt of another, *i.e.*, a suretyship agreement, is unenforceable unless it is in writing. However, there is nothing in the plain language of the statute of frauds to indicate that for a writing requirement to apply, the debt must exist prior to the time the promise to pay is made. The term "debt" is not limited or qualified in any way. Under the principles of construction set forth above, we do not find that the statute's application depends on whether the debt exists before the promise is made. To do so would read conditions into the statute that are not there. The plain language of the statute does the not require that a debt exist before a promise is made for the promise to fall within the statute.

Nor does the purpose underlying the statute of frauds require or support a preexisting debt rule. The statute of frauds "was adopted to give greater security to property; to guard against false contracts, set on foot by fraud and supported by perjury." *Hite v. Wells*, 17 Ill. 88, 90 (1855). In *Eddy v. Roberts*, 17 Ill. 505 (1856), we further stated:

> "The plain object of the statute is to require higher and more certain evidence to charge a party, where he does not receive

the substantial benefit of the transaction, and where another is primarily liable to pay the debt or discharge the duty; and thereby to afford greater security against the setting up of fraudulent demands, where the party sought to be charged is another than the real debtor, and whose debt or duty, on performance of the alleged contract by such third person, would be discharged." *Eddy*, 17 Ill. at 506.

More certain evidence is required when one promises to pay the debt of another because "[t]here is *** a temptation for a promisee, in a case where the real debtor has proved insolvent or unable to pay, to enlarge the scope of the promise, or to torture mere words of encouragement and confidence into an absolute promise." *Davis v. Patrick*, 141 U.S. 479, 487-88, 35 L. Ed. 826, 828, 12 S. Ct. 58, 59 (1891).

The concerns underlying the statute of frauds apply no matter when the debt was created–whether before the promise was made or after. A false contract "set on foot by fraud" can arise at any time. Indeed, as Justice Lytton noted below, "If anything, the promisor should be entitled to greater protection where the debt is incurred after the promise is made. Promisors of a preexisting debt are aware of the amount of debt and can prepare for the likelihood of liability. Promisors who agree to pay a debt that has yet to arise may be exposed to limitless liability." 366 Ill. App. 3d at 736 (Lytton, J., specially concurring).

Moreover, numerous authorities have recognized that there is no preexisting-debt rule. In *D'Wolf v. Rabaud*, 26 U.S. (1 Pet.) 476, 7 L. Ed. 227 (1828), the United States Supreme Court stated:

"Whether by the true intent of the statute, it was to extend to cases where the collateral promise, (so called,) was a part of the original agreement, and founded on the same consideration moving at the same time between the parties; or, whether it was confined to cases, where there was already a subsisting debt and demand, and the promise was merely founded upon a subsequent and distinct undertaking; might, if the point were entirely new, deserve very grave attention. But it has been closed within very narrow limits by the course of the authorities, and seems scarcely open for general examination; at least in those states where the English

authorities have been fully recognised and adopted in practice." *D'Wolf*, 26 U.S. (1 Pet.) at 499-500, 7 L. Ed. at 237.

See also 4 C. Brown, Corbin on Contracts §15.5, at 265 (rev. ed. 1997) (noting there is no preexisting-debt rule); R. Lord, Williston on Contracts §22:14, at 276-77 (4th ed. 1999) ("it is settled that a 'special promise' within the Statute may be made prior to or simultaneously with the creation of the principal obligation, and may be offered as an inducement to the creditor to enter into a contract with the principal debtor").

Despite the foregoing, the appellate court nonetheless concluded that a debt must exist before a promise is made for the promise to fall within the statute of frauds. The appellate court, relying on *Williams* and *Hartley Bros.*, concluded that these two cases "together stand directly for the proposition that the statute of frauds is applicable, in matters of surety, only where the promise to pay the debt of another was made after the obligation of the principal debtor had been incurred." 366 Ill. App. 3d at 734. Thus, according to the appellate court, *Williams* and *Hartley Bros.* hold that, if the debt does not exist at the time of the promise, the promise does not fall within the statute of frauds. A careful reading of the cases, however, shows they do not establish such a rule.

In *Williams*, Corbet delivered cattle to Caldwell. Corbet sought to recover the cost of the cattle from Williams, who allegedly had promised to pay for them. A judgment was entered in favor of Corbet following a jury trial. On appeal, this court affirmed. The court noted that Caldwell parted with the cattle only upon Williams' promise and undertaking, and that the consideration passed from Williams to Corbet. Further, the court noted that Williams was the person to whom the credit was given. From this, the court concluded that Williams' promise was not a suretyship, "and therefore not within the statute of frauds." *Williams*, 28 Ill. at 263.

After concluding that the promise did not fall within the statute of frauds, this court noted:

> "*It is not at all like a case where the contract is executed, and the promise to pay made after the debt was created; such a promise in such a case must, to be binding, be in writing.* That would be a promise 'to answer for the debt, default or

-8-

miscarriage of another,' and within the statute. So if the credit be not, at the time of the contract, given to the promisor." (Emphasis added.) *Williams*, 28 Ill. at 263.

The court went on to note that there had been conflicting testimony regarding the nature of Williams' promise, but that it was within the jury's province to resolve the conflict and the jury had done so, finding that Williams' promise did not create a suretyship. Accordingly, the trial court's judgment was affirmed.

Clearly, *Williams* does not hold that, in every instance where a debt does not exist at the time of the promise, the promise will, as a matter of law, fall outside the statute of frauds. Had *Williams* believed the timing of the promise to be the sole determining factor, there would have been no reason for the court to consider anything other than the timing of the promise in determining whether it fell within the statute. The court, however, did not limit its analysis in this way.

Similarly, if *Williams* had relied on the preexisting-debt rule, there would have been no logical reason for the court to defer to the jury's determination as to whether a suretyship had been created. Credibility determinations would have been irrelevant if the timing of the promise was the dispositive factor. Given the analysis undertaken in *Williams*, it is clear that the court did not rely solely on the timing of the promise in determining whether it fell within the statute of frauds.

The second case relied on by the appellate court below, *Hartley Bros.*, also does not employ a preexisting-debt rule to determine the applicability of the statute of frauds. In that case, Reubottom, who was Varner's employee, owed $8 or $9 to Hartley for goods he had received on credit. Later, Varner went to Hartley's store, at which time Hartley advised Varner that the store would not give Reubottom any more goods on credit. Varner then told Hartley that, if the store would give Reubottom goods, Varner would see that Hartley was paid. Hartley subsequently provided Reubottom with additional goods totaling $160.91. Hartley sought to recover the costs of the goods from Varner. After a jury trial, the circuit court entered judgment in favor of Varner. On appeal, Varner urged this court to affirm the trial court judgment, arguing that his promise fell within the statute of frauds. Citing only to *Williams*, and without any analysis, this court concluded that Varner's promise *did not fall* within the statute.

As Caterpillar noted at oral argument before this court, *Hartley Bros.* does not discuss the timing of the promise in relation to the creation of the debt. *Hartley Bros.* simply cited *Williams* and concluded that the promise fell outside the statute of frauds. The case does not support the conclusion that a preexisting-debt rule exists in Illinois.

As one court has stated, "Lesson Number One in the study of law is that general language in an opinion must not be ripped from its context to make a rule far broader than the factual circumstances which called forth the language." *Federal Deposit Insurance Corp. v. O'Neil*, 809 F.2d 350, 354 (7th Cir. 1987). Based on a careful examination of the language in *Williams* and *Hartley Bros.*, we conclude these cases do not establish a preexisting-debt rule. Thus, contrary to the appellate court's reasoning, *stare decisis* concerns are not present in this case.

Accordingly, based on the plain language of the statute of frauds and its underlying purpose, we hold there is no preexisting-debt rule in Illinois.

## II. "Main Purpose" or "Leading Object" Rule

Rosewood argues that, even if the appellate court erred in relying on the preexisting-debt rule, the court was correct when it reversed the circuit court's ruling granting Caterpillar's motion to dismiss. According to Rosewood, Caterpillar's promise falls outside the statute of frauds pursuant to the "main purpose" or "leading object" rule. Under this rule, when the "main purpose" or "leading object" of the promisor/surety is to subserve or advance its own pecuniary or business interests, the promise does not fall within the statute. P. Alces, Law of Suretyship and Guaranty §4:19 (1996). As section 11 of Restatement (Third) of Suretyship & Guaranty states:

> "A contract that all or part of the duty of the principal obligor to the obligee shall be satisfied by the secondary obligor is not within the Statute of Frauds as a promise to answer for the duty of another if the consideration for the promise is in fact or apparently desired by the secondary obligor mainly for its own economic benefit, rather than the

benefit of the principal obligor." Restatement (Third) of Suretyship & Guaranty §11(3)(c), at 42 (1996).

See also Restatement (Second) of Contracts §116, at 299 (1981).

The reason for the "main purpose" or "leading object" rule has been explained:

> "Where the secondary obligor's main purpose is its own pecuniary or business advantage, the gratuitous or sentimental element often present in suretyship is eliminated, the likelihood of disproportion in the values exchanged between secondary obligor and obligee is reduced, and the commercial context commonly provides evidentiary safeguards. Thus, there is less need for cautionary or evidentiary formality than in other secondary obligations." Restatement (Third) Suretyship & Guaranty §11, Comment to Subsection (3)(c), at 49-50 (1996).

See also Restatement (Second) of Contracts §116, Comment *a*, at 299 (1981); 72 Am. Jur. 2d *Statute of Frauds* §134, at 658 (2001) ("Cases sometimes arise in which, although a third party is the primary debtor, the promisor has a personal, immediate, and pecuniary interest in the transaction, and is therefore himself a party to be benefited by the performance of the promisee. In such cases the reason which underlies and which prompted this statutory provision fails, and the courts will give effect to the promise").

This court has employed the "main purpose" or "leading object" rule on two occasions. In *Clifford v. Luhring*, 69 Ill. 401 (1873), this court cited *Nelson v. Boynton*, 3 Metc. (Mass.) 396, 400 (1841), the case which first established the rule. In *Clifford*, we stated: "where the leading object of the undertaker is to promote some interest of his own, the promise is not within the statute, although its effect is to release or suspend the debt of another." *Clifford*, 69 Ill. at 402.

Next, in *Borchsenius v. Canutson*, 100 Ill. 82 (1881), citing *Clifford*, we concluded that the defendant's promise fell outside the statute because the promise "inured directly to [her] benefit." *Borchsenius*, 100 Ill. at 93.

More recently, our appellate court employed the rule in *Schwartzberg v. Dresner*, 107 Ill. App. 3d 318 (1982), holding:

"The provisions of the statute apply to promises, the main purposes of which are to assume or guarantee the debt of another, and they do not apply to cases in which credit is extended to the promisor, or to cases in which the object or the promise is to promote some interest, purpose or advantage of the promisor." *Schwartzberg*, 107 Ill. App. 3d at 324.

It is clear from the cases cited above that the "main purpose" or "leading object" rule, as set out in the Restatements, has been a part of Illinois law since 1873. We note that the majority of jurisdictions have adopted this rule as well. 4 C. Brown, Corbin on Contracts §16.1, at 314-15 (1997). See, *e.g.*, *New Economy Capital, LLC v. New Markets Capital Group*, 881 A.2d 1087 (D.C. App. 2005); *Cocco v. Schmitz*, 103 S.W.3d 403 (Mo. App. 2003); *Trans-Gear, Inc. v. Lichtenberger*, 128 Ohio App. 3d 504, 715 N.E.2d 608 (1998); *UCSF-Stanford Health Care v. Hawaii Management Alliance Benefits & Services, Inc.*, 58 F. Supp. 2d 1162 (D. Haw. 1999); *Wolff Ardis, P.C. v. Kimball Products, Inc.*, 289 F. Supp. 2d 937 (W.D. Tenn. 2003).

Applying this rule in the case at bar, Caterpillar denies that the "main purpose" for its alleged promise to Rosewood was to promote its own interest. Caterpillar also denies that it received any benefit from the agreement. Alternatively, Caterpillar argues that we should remand this cause for further proceedings to determine the "main purpose" or "leading object" of its promise.

Whether the "main purpose" or "leading object" of the promisor is to promote a pecuniary or business advantage to it is generally a question for the trier of fact. 9 R. Lord, Williston on Contracts §22:20, at 308 (4th ed. 1999). In making this determination, the following factors may be considered: "prior default, inability or repudiation of the principal obligor; forbearance of the creditor to enforce a lien on property in which the promisor has an interest or which he intends to use; equivalence between the value of the benefit and the amount promised; lack of participation by the principal obligor in the making of the surety's promise; a larger transaction to which the suretyship is incidental." Restatement (Second) of Contracts §116, Comment *b*, at 300 (1981). See also Restatement (Third) of Suretyship & Guaranty §11, Comment to Subsection (3)(c) (1996); P. Alces, Law of Suretyship & Guaranty, §4:20 (1996). The crux of

this inquiry is the reason the promisor made the promise, *i.e.*, the impetus for the promise. See *Davis*, 141 U.S. at 488, 35 L. Ed. at 829, 12 S. Ct. at 60 ("there is a marked difference between a promise which, without any interest in the subject-matter of the promise in the promisor *** and that which, though operating upon the debt of a third party, is also and mainly for the benefit of the promisor").

Here, a decision on what was Caterpillar's "main purpose" or "leading object" in making the promise cannot be made based on the allegations in the complaint. What is required is evidence from which one can ascertain whether the reason for Caterpillar's promise was in fact or apparently desired by Caterpillar mainly for its own advantage. The determination must be made by the trier of fact based on evidence to be presented by the parties. Since genuine issues of material fact exist, this precludes dismissal of Rosewood's complaint. *Carroll v. Paddock*, 199 Ill. 2d 16, 22 (2002). Accordingly, this cause must be remanded for further proceedings to determine the "leading object" or "main purpose" of Caterpillar's promise.

### III. Whether a Suretyship Was Created in This Case

Rosewood makes a final argument for why Caterpillar's promise is not within the statute of frauds. Rosewood argues that no suretyship was created by Caterpillar's promise. According to Rosewood, Caterpillar contracted directly with Rosewood, became liable for its own commitment, and received benefits as a result.

A suretyship exists when one person undertakes an obligation of another person who is also under an obligation or duty to the creditor/obligee. Restatement (First) of Security §82 (1941). Specifically, "[a] contract is not within the Statute of Frauds as a contract to answer for the duty of another unless the promisee is an obligee of the other's duty, the promisor is a surety for the other, and the promisee knows or has reason to know of the suretyship relation." Restatement (Second) of Contracts §112, at 292 (1981). Moreover:

> "Where promises of the same performance are made by two persons for a consideration which inures to the benefit of only one of them, the promise of the other is within the Statute of Frauds as a contract to answer for the duty of another, whether or not the promise is in terms conditional on

default by the one to whose benefit the consideration inures, unless

(a) the other is not a surety for the one to whose benefit the consideration inures; or

\*\*\*

(c) the promisee neither knows nor has reason to know that the consideration does not inure to the benefit of both promisors." Restatement (Second) of Contracts §113, at 295-96 (1981).

See also Restatement (Third) of Suretyship & Guaranty §11(2)(a), at 41 (1996). The question of whether a surety contract exists, the terms and conditions of any such contract, and the parties' intent are questions to be determined by the trier of fact. See *Howard A. Koop & Associates v. KPK Corp.*, 119 Ill. App. 3d 391, 400 (1983).

The question of whether Caterpillar's promise was a suretyship or not, like the question regarding Caterpillar's "main purpose" or "leading object," cannot be determined on the basis of allegations in Rosewood's complaint. This question is a factual one to be made based on evidence to be presented by the parties. Accordingly, this issue must also be resolved by the circuit court on remand.

## CONCLUSION

There is no preexisting-debt rule in Illinois. Moreover, the "main purpose" or "leading object" rule has been and is the rule for determining whether a promise to pay the debt of another is removed from the statute of frauds. We further hold that whether a suretyship was created and a determination of the "main purpose" or "leading object" of Caterpillar's promise are fact questions. As a result, we affirm the appellate court's judgment that the trial court improperly dismissed Rosewood's complaint. We remand this cause to the circuit court for further proceedings consistent with this opinion.

*Appellate court judgment affirmed;*
*cause remanded.*