Filed 8/24/10        NO. 4-09-0913

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| K.D., by and Through His Parents, | ) | Appeal from |
| NICHELLE D. and BRADLEY D., | ) | Circuit Court of |
|       Plaintiffs-Appellees, | ) | Douglas County |
|       v. | ) | No. 09CH27 |
| VILLA GROVE COMMUNITY UNIT SCHOOL | ) | |
| DISTRICT NO. 302 BOARD OF EDUCATION; | ) | |
| and DR. STEVEN POZNIC, in His | ) | |
| Official Capacity as District No. 302 | ) | Honorable |
| Superintendent, | ) | Chris E. Freese, |
|       Defendants-Appellants. | ) | Judge Presiding. |

_____

JUSTICE KNECHT delivered the opinion of the court:

In July 2009, plaintiff, K.D., by and through his parents, Nichelle D. and Bradley D., filed a complaint for injunctive relief alleging defendants, Villa Grove Community Unit School District No. 302 and Dr. Steven Poznic, in his official capacity as District No. 302 superintendent (referred to collectively herein as the District), violated section 14-6.02 of the School Code (105 ILCS 5/14-6.02 (West 2008)) by denying K.D., a student with autism, use of a service animal. In November 2009, the trial court entered an order finding K.D.'s dog to be a service animal and ordering the District to allow K.D. to bring the dog to school functions.

The District appeals, arguing the trial court erred in granting plaintiffs injunctive relief because (1) plaintiffs failed to exhaust their administrative remedies and (2) K.D.'s

dog was not a "service animal" pursuant to section 14-6.02 of the School Code. We disagree and affirm.

## I. BACKGROUND

When this action commenced, K.D. was six years old and attending Villa Grove Elementary School, a school located within the District. K.D. is autistic, which places him under the purview of article 14 of the School Code (105 ILCS 5/14-1.01 through 14-16 (West 2008)) as a child with a disability. In May 2009, K.D. received a Labrador retriever named "Chewey" from Autism Service Dogs of America (ASDA). Later that month, the District sent plaintiffs a letter informing them Chewey was prohibited from accompanying K.D. to school. Plaintiffs continued to negotiate with the District as to Chewey's entry into the school. On June 29, 2009, the District informed K.D.'s parents it prohibited Chewey from attending school with K.D. that summer. K.D. was enrolled in an extended school-year program to prevent his academic and functional skills from regressing during the summer scheduled to begin July 1, 2009, but was unable to attend after the District refused to allow Chewey to accompany K.D. to class.

On July 9, 2009, K.D.'s parents filed a verified complaint and a motion for temporary restraining order and preliminary injunction on K.D.'s behalf, claiming section 14-6.02 of the School Code (105 ILCS 5/14-6.02 (West 2008)) permitted

- 2 -

K.D. to bring Chewey with him to Villa Grove Elementary School.

On July 13, 2009, the District filed a motion to dismiss plaintiffs' motion for temporary restraining order and preliminary injunction, contending (1) plaintiffs failed to exhaust their administrative remedies before commencing their action before the trial court and (2) Chewey was not a "service animal" for purposes of section 14-6.02 of the School Code. After a hearing the following day, the court denied the District's motion and granted plaintiffs' motion for a temporary restraining order, thereby enjoining the District from denying Chewey from attending school with K.D. As a result, Chewey accompanied K.D. to school during the entire 2009-2010 school year.

In August 2009, plaintiffs amended their complaint regarding the prayer for relief. Upon amendment, plaintiffs sought a trial court order requiring the District to not only permit Chewey to attend school with K.D. but also (1) train at least one primary staff member and one backup staff member in service-animal equipment and the necessary commands for Chewey to accompany K.D. to all school functions; (2) designate one primary staff member to hold Chewey's leash while K.D. is also tethered to Chewey during student transition periods throughout the school day; (3) designate one primary staff member to release K.D. from his tether while he uses the restroom facilities and during

- 3 -

periods with heavy physical activity, such as physical-education classes; and (4) allow Chewey access to water and to relieve himself when appropriate during the school day. The District filed a motion to strike the amended prayer for relief. The court allowed the District's motion, finding plaintiffs' requested relief exceeded the scope of the School Code.

On November 10, 2009, the trial court conducted a hearing on plaintiffs' complaint. At the hearing, plaintiffs called two witnesses, Kati Witko and Nichelle D., and the District called three, Aimee Reardon, Kathy Burgess, and Beth Wiessing.

Witko testified ASDA employs her as a program training director. Witko holds a two-year "dog certificate" from Animal Behavior College, and her job consists of training dogs to assist children with autism, including Chewey.

According to Witko, ASDA dogs receive approximately 16 months of training, beginning when the dogs are between 6 and 8 months old. As part of a dog's training, ASDA employees take the dog to schools, with both autistic and nonautistic children, so it can learn to remain calm around children who exhibit loud behavior. While at school with its child, a dog remains in a "down-stay" position, which "can look like sleeping," to keep the child calm and safe. The dog does not move from the down-stay position unless commanded by its handler. Accordingly, the

handler plays "a big role" by ensuring the dog does "what he's supposed to at the right time."

Witko stated Chewey is not currently commanded by K.D. because K.D. does not function at a level where he could provide Chewey with a sense of leadership or control. Rather, he is specifically trained not to respond to K.D.'s commands, and thus someone else must command him. Although Chewey knows over 30 commands, a handler needs to know only 5 to manage Chewey in a school environment. Chewey's main handler is K.D.'s mother, Nichelle.

Witko further testified Nichelle received training in Oregon with Chewey before ASDA placed Chewey with the family in Villa Grove. After placement, Witko flew to plaintiffs' home in May 2009 to teach Chewey how to apply his training to K.D. Typically, such training includes school placement, but because the District refused to allow Chewey in K.D.'s elementary school, Witko could not perform such placement during her May 2009 visit. However, she was able to conduct the training upon her return in August 2009, which K.D.'s speech teacher, his one-on-one aide, the head of special education at the school, and "some fill-in aides" attended. Upon completion of the training, Witko provided written information, her phone number, and her e-mail address. No one from the school contacted Witko, and Witko's follow-up telephone calls were never returned.

According to Witko, Chewey's training taught him to stand his ground when tethered to K.D., thereby preventing K.D. from running away. Witko explained when autistic children are outside, they need to be held onto to prevent them from running off into dangerous situations. The tether system provides children with a sense of interdependence and an ability to move about how the children wish without being held onto by an adult. Tethering also reassures family members and school staff the child will not run, and thus it permits them to "do more things and get [the child] more into the social realm and environment." Witko also explained Chewey aids K.D. during transitional periods by applying deep pressure with his head or paw upon command, something children with autism "seek and need."

Witko emphasized the importance of K.D. and Chewey working together at all times when outside the home. In doing so, K.D. and Chewey form a bond, which will cause K.D. "to want to be by his dog and to not feel the desire to run off and to really not be able to run off because of that tether but because he wants to be by his dog."

K.D.'s mother, Nichelle, testified K.D.'s autism causes him to run away frequently in public into dangerous situations from her, her husband, and K.D.'s aides at school and to leave the house at night while the rest of the family sleeps. As K.D. grows stronger, Nichelle has more difficulty controlling him.

K.D. also has difficulty with transitions from the house to public places, such as school or church. Prior to Chewey's arrival, K.D. adapted poorly to changes in his routine and had difficulty sleeping, averaging two to three hours per night.

Nichelle and her husband obtained Chewey to keep K.D. safe and calm him down. Since receiving Chewey, K.D. becomes upset for shorter periods of time, completes his homework, and sleeps between six to eight hours per night. He has less difficulty transitioning between home and other public places, including school. As an example, Nichelle cited K.D.'s morning arrival at school, which used to involve frequent tantrums but, after Chewey, occurs "calmly, happily." Nichelle attributed these changes to Chewey's ability to apply pressure upon command to K.D., which calms K.D. and recenters him to the task at hand. Nichelle also noted Chewey makes K.D. safer because he keeps K.D. from running away and barks in the night if K.D. leaves his bed.

In January 2008, prior to undergoing the extensive application process for a ASDA-trained dog, Nichelle informed K.D.'s teacher she planned on obtaining a dog to assist K.D. In summer 2008, Nichelle filled out an application with ASDA. After requesting an individualized education plan meeting to discuss the dog accompanying K.D. to school and K.D.'s diet, the District informed Nichelle in December 2008 it denied the dog access.

At the close of plaintiffs' evidence, the District

moved for a directed judgment, which the trial court denied.  The District then presented the following testimony.

Reardon testified the District employs her as K.D.'s one-on-one aide.  Reardon assists K.D. with "transitioning" from place to place, his homework, and any other needs arising during his time in the classroom.  Regarding Chewey, Reardon testified the dog does "nothing" when not commanded by her or another adult.  Reardon also testified she often repeats commands two or three times before Chewey responds.  When other dogs are near the playground, "Chewey will bark *** and try to pull to go to the other dogs."  Occasionally, Chewey barks in school and sniffs at other students.  In the month prior to testifying, Reardon experienced difficulty from Chewey when he tried to remove the gentle leader located around his mouth and attached to his leash.  Approximately once a week, Reardon reported Chewey acts "con-flicted" when K.D. issues a command differing from a command issued by Reardon.  Sometimes, Chewey moves in the classroom when he should remain still.  Reardon further stated Chewey does nothing to benefit K.D., reasoning "[h]e has to be commanded by me to do anything he needs to do; and generally, he's just lying on the ground."

On cross-examination, Reardon admitted she knows the command to correct any inappropriate behavior by Chewey and uses it effectively.  She further admitted she feels confident as

Chewey's handler. After she experienced difficulties with Chewey's gentle leader, she consulted K.D.'s mother, who promised to order a new gentle leader. Reardon also contacted K.D.'s mother about having to repeat commands to Chewey, to which K.D.'s mother advised Reardon to be more authoritative. Reardon acknowledged despite her testimony Chewey does nothing for K.D., she had observed him tethered to K.D. during transition periods, commanded him to find K.D. when untethered, and observed him apply deep pressure to K.D.

Burgess testified she works as a full-time aide for the District. Her duties include "a lot of fill-in work for other students [and] relieving other teachers *** for breaks." She spends time daily with K.D. during lunch and recess. Regarding Chewey, Burgess tethers and untethers him after transitions from the classroom to the lunchroom to outside. On three occasions, Chewey spotted other dogs and barked at them. Once, Burgess took Chewey outside for a bathroom break, Chewey spotted another dog, and "it took two of [Burgess's] hands to hold him back." Burgess stated she often repeats commands to Chewey two or three times before he responds. Not once has she seen Chewey respond to commands given by K.D.

Burgess contrasted K.D.'s behavior at the beginning of the 2009 school year with his behavior the previous year. She noted he transitions poorly from recess to the classroom, some-

thing he had less problems with during the 2008-2009 school year. Burgess also noted K.D. acts up in the bathroom, an issue not arising previously. During these times, Chewey is not tethered to K.D.

On cross-examination, Burgess admitted she never notified K.D.'s mother or the ASDA trainer about Chewey's barking at other dogs because it is not a consistent problem. She further admitted not watching Chewey closely during the lunch hour because her eyes are on K.D., who is not tethered to Chewey during that time.

Finally, Wiessing testified the District employs her as a speech-language pathologist. Wiessing has training and certification in working with autistic children. Wiessing worked with K.D. during the 2008-2009 school year, before Chewey's arrival, and during the 2009-2010 school year, after Chewey's arrival. During the 2009-2010 school year, Wiessing met with K.D. 4 days per week for approximately 15 to 20 minutes. She also saw K.D. frequently in the hallways, on the playground, and in the cafeteria. During "the first couple weeks of school" in 2009, Wiessing observed K.D. in his classroom three to four days per week.

Chewey's behavior concerned Wiessing because he increasingly stood up when K.D. stood up, despite not being commanded to do so. Once, K.D. was untethered and ran down the hallway, followed by Chewey, who ignored the aide's command to

stop.  Wiessing stated she often repeats commands frequently, "anywhere from two to three [times]."

Since the start of the 2009-2010 school year, Wiessing observed (1) K.D. throwing more tantrums, of a longer duration than the previous school year; (2) an increase in K.D.'s use of echolalia, an involuntary echoing of things K.D. has heard; (3) a decrease of independence; and (4) a decrease in K.D.'s use of spontaneous language.  Wiessing attributed the decrease in K.D.'s independence to the fact K.D. used to travel by himself, followed by his aide, to each location on his schedule but during the current school year K.D. traveled with at least "two individuals and a dog."  However, she did not explain the reason for the increase in individuals traveling with K.D. and admitted for part of 2009-2010 school year, K.D. did not have a photographic map of the locations on his schedule as he did during the previous school year.  As to K.D.'s decrease in spontaneous language, Wiessing attributed part of the decrease to regression during the summer but noted "[i]t was much longer than [she] expected this year."  Wiessing further opined Chewey did nothing to aid K.D., citing an incident where K.D. had a tantrum and Chewey placed his paw on K.D.'s back to calm him but K.D. got up, Chewey removed his paw, and the tantrum continued.

On cross-examination, Wiessing stated K.D. received no speech therapy during the summer.  Because Wiessing only saw K.D.

- 11 -

during two school years, she experienced only one extensive period where K.D. came back to school after a long break.  The previous school year, Wiessing experienced difficulty providing K.D. therapy because he often slept during their sessions, something K.D. no longer does.  Wiessing also explained several differences existed between the current school year and the previous one, which included (1) K.D having a new teacher; (2) K.D. having Reardon as his one-on-one aide, who was not his aide the previous year; and (3) a new classroom for K.D.'s speech therapy.

After hearing the above evidence, the trial court ruled in plaintiffs' favor, finding (1) the District violated section 14-6.02 of the School Code and (2) Chewey is a service animal within the meaning of the statute because he is individually trained to perform tasks for K.D.'s benefit.  In support of its decision, the court reasoned as follows:

"This is not about the burden of the parents. It's not about the difficult task of the school.  It's about one sentence in one sec- tion of the School Code, and that sentence is extremely simple.

***

This is not even a close case.  ***
[P]laintiff[s] ha[ve] shown far beyond a

- 12 -

preponderance of the evidence that the dog in this case fits [the 'service animal' definition set forth in section 14-6.02 of the School Code].  ***

Has this dog been individually trained[-?]  The evidence is uncontradicted that the dog was individually trained to attempt to benefit an autistic child.  Not in dispute.

Does the child in question have a disability[?]  Not in dispute.  Uncontradicted.  The child has autism.

Are there tasks for the benefit of the student that the dog has been trained to perform[?]  And the statute does not say it has to be tasks at school.  ***  It says the dog has to be, has to be trained to perform tasks that benefit the student.  Period.  It does not say that the task can only be performed with the command of a handler.  Doesn't say that.

The tasks that this dog has been trained to perform, and which, in fact, clearly benefit this child are as follows--they have been testified to very clearly in this case--we

- 13 -

have a deep[-]pressure technique which gives a calming effect for the child.

We have a tether situation which helps the child locate a specific place and keeps the child from running away on a whim.  The dog helps the child focus on various tasks the child is performing; and, perhaps even the most important one, this dog helps this child get into school in the morning without incident.

Now, have these tasks, every single day, been performed without problem?  Absolutely not.  Does that mean the school can keep the dog out?  Not the way the School [C]ode is written.

*** [B]ased on th[e] statute and the facts in this case, there can only be one decision.  And that is the school must allow the dog admission with this student."

The court entered a written order on November 24, 2009, in which it ordered the District to permit Chewey to accompany K.D. to all school functions, regardless of whether the functions were inside the classroom.

This appeal followed.

## II. ANALYSIS

On appeal, the District contends the trial court erred in granting plaintiffs injunctive relief because (1) plaintiffs failed to exhaust their administrative remedies and (2) K.D.'s dog is not a service animal pursuant to section 14-6.02 of the School Code.

### A. Exhaustion of Administrative Remedies

Initially, the District argues the trial court lacked jurisdiction over this case because plaintiffs failed to exhaust their administrative remedies prior to filing suit. Specifically, the District alleges plaintiffs should have sought a special-education due-process hearing under section 14-8.02a(f) of the School Code (105 ILCS 5/14-8.02a(f) (West 2008)) and, because plaintiffs failed to do so, the court should have granted the District's motion to dismiss plaintiffs' complaint.

An appellate court reviews de novo a trial court's grant or denial of a motion to dismiss. Simmons v. Homatas, 236 Ill. 2d 459, 477, 925 N.E.2d 1089, 1100 (2010).

Generally, aggrieved parties may not file suit in circuit court without first exhausting their administrative remedies. Poindexter v. State of Illinois, 229 Ill. 2d 194, 206-07, 890 N.E.2d 410, 419 (2008). "The purpose of the [exhaustion-of-remedies] doctrine is *** to permit [administrative bodies] to apply the special expertise that they possess." North Trust Co.

<u>v. County of Lake</u>, 353 Ill. App. 3d 268, 276, 818 N.E.2d 389, 397 (2004).  Accordingly, exhaustion is not required if the administrative agency's expertise is not involved.  <u>Morr-Fitz, Inc. v. Blagojevich</u>, 231 Ill. 2d 474, 499, 901 N.E.2d 373, 390 (2008).

Pertinent to the case at bar, section 14-8.02a(f) of the School Code permits the State Board of Education to conduct an impartial due-process hearing upon request by a parent.  105 ILCS 5/14-8.02a(f) (West 2008).  The State Board of Education's duty is to carry out the federal Individuals with Disabilities Education Act (20 U.S.C. §§1400 through 1482 (2006)), which requires exhaustion of administrative remedies "to channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances."  <u>Polera v. Board of Education of Newburgh Enlarged City School District</u>, 288 F.3d 478, 487 (2d Cir. 2002).

The case at bar presents a single question:  whether Chewey constitutes a service animal under the Illinois School Code, a matter irrelevant to any educational benefit he provides K.D.  The School Code's definition of "service animal" is not a matter within school administrators' expertise.  Rather, the School Code exempts reference to any educational benefit from the definition of "service animal" and instead merely requires an animal be "individually trained to perform tasks for the benefit

- 17 -

of a student." 105 ILCS 5/14-6.02 (West 2008); see also Kalbfleisch v. Columbia Community Unit School District Unit No. 4, 396 Ill. App. 3d 1105, 1115-16, 920 N.E.2d 651, 661 (2009) ("[t]he language of [section 14-6.02] does not include the term 'educational benefit,' and we '"should not attempt to read a statute other than in the manner in which it was written"' [citations]"). Thus, the educational expertise of school administrators and the State Board of Education is irrelevant. As discussed below, despite the inevitable impact a service animal's presence at school will have on a student's individualized education plan, the School Code requires school districts admit the service animal with the student as long as the animal meets the definition set forth in section 14-6.02. The statute contains no language regarding the educational impact caused by the animal's presence. Because the definition excludes reference to the service animal's impact on the student's education, any hearing conducted by school administrators would simply amount to interpretation of the statute's language--i.e., whether the animal the disabled student seeks to bring to school is "individually trained to perform tasks for the benefit of a student." This is a matter well within a circuit court's jurisdiction.

In rejecting the District's argument the exhaustion-of-remedies doctrine applies in this case, we are unpersuaded by the District's heavy reliance on the Second Circuit Court of Appeals'

decision in <u>Cave v. East Meadow Union Free School District</u>, 514 F.3d 240, 245 (2d Cir. 2008).  <u>Cave</u>'s outcome depended on federal statutes, none of which included a service-animal definition similar to that contained in the Illinois School Code at issue in this case.  Thus, despite the factual similarities between <u>Cave</u> and the case at bar, we decline to follow its logic.

In sum, the trial court properly denied the District's motion to dismiss because plaintiffs were not required to seek a due-process hearing under section 14-8.02a(f) of the School Code prior to filing suit in the circuit court.

B. Section 14-6.02's "Service Animal" Definition

Next, the District argues plaintiffs failed to show Chewey constitutes a "service animal" within the meaning of section 14-6.02.  Specifically, the District contends (1) Chewey "provides no tangible tasks for K.D.'s benefit," (2) Chewey's training "is not such to reflect the appropriate behaviors expected," (3) "any act [Chewey] does do is at the command of an adult handler--not on [his] own or at the command of K.D."--and therefore Chewey does not "accompany" K.D. for purposes of the statute, and (4) Chewey's behavior does not benefit K.D. but instead "has actually caused K.D. to regress in his educational and functional development."  Because (1) the record before us on appeal establishes Chewey provides some benefit to K.D. and (2) the District's remaining arguments reach beyond the plain,

- 19 -

unambiguous meaning of the statute, we disagree.

Interpreting a statute is a question of law, which an appellate court reviews de novo. Ryan v. Board of Trustees of the General Assembly Retirement System, 236 Ill. 2d 315, 319, 924 N.E.2d 970, 973 (2010). When interpreting a statute, the fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. Ryan, 236 Ill. 2d at 319, 924 N.E.2d at 973. In that process, the language of the statute is the best indicator of legislative intent, which courts give its plain and ordinary meaning. Rosewood Care Center, Inc. v. Caterpillar, Inc., 226 Ill. 2d 559, 567, 877 N.E.2d 1091, 1096 (2007). "We may not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent." Rosewood Care Center, Inc., 226 Ill. 2d at 567, 877 N.E.2d at 1096.

At issue in the case at bar is section 14-6.02 of the School Code, which states as follows:

> "Service animals such as guide dogs, signal dogs[,] or any other animal individually trained to perform tasks for the benefit of a student with a disability shall be permitted to accompany that student at all school functions, whether in or outside the classroom." 105 ILCS 5/14-6.02 (West 2008).

The facts set forth in the record before us on appeal establish Chewey constitutes a service animal under section 14-6.02. The ASDA trainer and K.D.'s mother both testified Chewey performs specific tasks to benefit K.D. by (1) preventing him from running away through tethering and (2) applying deep pressure to calm K.D. when he experiences a tantrum. K.D.'s mother further testified since Chewey's arrival, the deep pressure Chewey applies has caused (1) K.D.'s sleep to improve from two to three hours per night to six to eight hours per night, (2) less difficulty when K.D. transitions from home to school in the mornings, and (3) K.D. to focus more easily on his homework. According to K.D.'s mother, the tethering between Chewey and K.D. decreases the risk of K.D. running away because he is tethered to Chewey most of the day and Chewey alerts the family when K.D. leaves his bed at night. Despite the District's assertion Chewey "provides no tangible benefit to K.D.," the District's witnesses also agreed they observed Chewey being tethered to K.D. and applying deep pressure to K.D. during tantrums. Moreover, Chewey's trainer testified she traveled to K.D.'s home to adapt Chewey's autism-related training specifically to K.D. and noted separation between K.D. and Chewey weakens the special bond between them. Taken together, this evidence establishes Chewey is individually trained to perform tasks for K.D.'s benefit.

The District further argues Chewey's behavior (1) fails

to "reflect the appropriate behaviors expected" and (2) does not benefit K.D. but instead "has actually caused K.D. to regress in his educational and functional development." These arguments exceed the plain meaning of the statute. Regardless of whether Chewey's behavior varies from his training, section 14-6.02 does not specify service animals must behave perfectly at all times. Moreover, the statute does not require evaluating the disabled child's educational and behavioral performances before labeling the animal assisting the child a "service animal."

The District also contends Chewey is not a service animal because he cannot "accompany" K.D. pursuant to section 14-6.02 because "any act [Chewey] does do is at the command of an adult handler--not on [his] own or at the command of K.D." Again, no statutory language suggests affording "accompany" a definition other than its plain, ordinary meaning. Generally, "accompany" is defined as "to go with as an associate or companion." Merriam-Webster's Collegiate Dictionary at 7 (10th ed. 2000); see also People v. Fort, 373 Ill. App. 3d 882, 885, 869 N.E.2d 950, 953 (2007) (in ascertaining the plain and ordinary meaning of the language used in a statute, a court may "'turn to a dictionary when determining the meaning of an otherwise unde-fined word or phrase' [citation]"). The District's assertion K.D.--not an adult handler--must control Chewey for the dog to "accompany" K.D. is unpersuasive because the plain meaning of

- 22 -

"accompany" does not encompass "control." To allow the District's interpretation to prevail would require this court to turn to the discussion of service animals in other statutes cited by the District, such as the Individuals with Disabilities Education Act (20 U.S.C. §§1400 through 1482 (2006)), the Americans with Disabilities Act of 1990 (42 U.S.C. §§12101 through 12213 (2006)), and the Vocational Rehabilitation Act Amendments of 1998 (29 U.S.C. §§794 through 794(e) (2006)). However, as noted above, section 14-6.02 is unambiguous and thus turning to other aids of statutory construction is unnecessary.

We conclude Chewey is a service animal individually trained to perform tasks for K.D.'s benefit. On its face, section 14-6.02 permits Chewey to attend school with K.D. Thus, the trial court did not err in ordering the District to permit Chewey to accompany K.D. to all school functions.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

STEIGMANN and McCULLOUGH, JJ., concur.