**2021 IL 125386**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125386)

DAVID W. COOKE, Appellee, v. THE ILLINOIS STATE BOARD OF
ELECTIONS *et al.* (Committee for Frank J. Mautino, Appellant).

*Opinion filed May 20, 2021.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Theis, Michael J. Burke, and
Overstreet concurred in the judgment and opinion.

Justices Neville and Carter took no part in the decision.

**OPINION**

¶ 1    In 2016, David W. Cooke filed a complaint against the Committee for Frank J.
Mautino (Committee) with the Illinois State Board of Elections (Board). Cooke
alleged that, in violation of the Election Code (Code), the Committee had filed

inadequate expenditure [1] reports (10 ILCS 5/9-7 (West 2014)) and made expenditures that did not comply with section 9-8.10 (*id.* § 9-8.10). Ultimately, the Board held that the Committee willfully violated its order to amend its expenditure reports and imposed a $5000 fine against the Committee. Cooke appealed to the appellate court because the Board did not reach the merits of his complaint, namely, whether the Committee violated sections 9-8.10(a)(2) and 9-8.10(a)(9)[2] (*id.* § 9-8.10(a)(2), (9)). The appellate court remanded the cause to the Board with directions to reach the merits. *Cooke v. Illinois State Board of Elections*, 2018 IL App (4th) 170470, ¶ 95. On remand, the Board deadlocked in a 4 to 4 vote on both issues and therefore found that Cooke had not met his burden in establishing violations of either section. Again, Cooke appealed. Relevant here, the appellate court reversed the Board's findings that Cooke had not met his burden in establishing violations of sections 9-8.10(a)(2) and 9-8.10(a)(9). 2019 IL App (4th) 180502, ¶ 89. The Committee filed a petition for leave to appeal, which we allowed. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019).

¶ 2                                    BACKGROUND

¶ 3        Due to the lengthy procedural history of this case, we set out only those facts that are pertinent to our review.[3] For 24 years, Frank J. Mautino (Mautino) served as an Illinois state representative. The Committee had been formed and functioned as a candidate political committee[4] to promote Mautino's election and retention. On January 1, 2016, Mautino was appointed to the position of Illinois Auditor General. Prior to Mautino assuming that role, the Committee was dissolved. See 30 ILCS 5/2-7 (West 2014). In light of its dissolution, the Committee had filed its final

---

[1]Relevant here, the Code defines "expenditure" as "a payment, distribution, purchase, loan, advance, deposit, gift of money, or anything of value, in connection with the nomination of election, election, or retention of any person to or in public office or in connection with any question of public policy." 10 ILCS 5/9-1.5(A)(1) (West 2014).

[2]Essentially, the issues of the Committee's reporting and the propriety of certain expenditures were effectively bifurcated.

[3]For a more detailed recitation of the facts and procedural history, see *Cooke*, 2018 IL App (4th) 170470, ¶¶ 3-78.

[4]A "candidate political committee" is defined as "the candidate himself or herself or any natural person, trust, partnership, corporation, or other organization or group of persons designated by the candidate that accepts contributions or makes expenditures during any 12-month period in an aggregate amount exceeding $5,000 on behalf of the candidate." 10 ILCS 5/9-1.8(b) (West 2014).

report with the Board on December 30, 2015. See 10 ILCS 5/9-5 (West 2014). The Committee destroyed its records that were dated prior to 2014. See *id.* § 9-7.

¶ 4                                    Cooke's Complaint

¶ 5        On February 16, 2016, the Board received Cooke's *pro se* complaint, which alleged various violations of article 9 of the Code (Act to Regulate Campaign Financing) (10 ILCS 5/art. 9 (West 2014)). Cooke detailed how several newspapers had begun "questioning the documentation of the spending of Mr. Mautino's Campaign." Cooke's complaint noted "documentation issues" that were potentially violative of section 9-7, "Records and accounts." *Id.* § 9-7. Also, Cooke's complaint focused upon two categories of the Committee's spending that were allegedly violative of section 9-8.10, "Use of political committee and other reporting organization funds." See *id.*; *id.* § 9-8.10. Cooke observed that "[a] majority of the expenses are recorded in whole dollar amounts, which strains reason to believe these expenses are for actual services rendered." Cooke asserted that "extremely high amounts of expenses were allocated to Happy's Super Service in Spring Valley" and that the amounts totaled over $200,000 for just over a 10-year period. Additionally, Cooke complained that the Committee's documentation inappropriately listed expenditures as made directly to Spring Valley City Bank rather than to the ultimate recipient.

¶ 6                                Closed Preliminary Hearing

¶ 7        On March 1, 2016, a closed preliminary hearing was held. See *id.* § 9-21. Relevant here, the hearing officer recommended that the Board enter an order finding that the complaint was filed upon justifiable grounds and that the matter proceed to a public hearing unless the Committee opted to timely file amended reports with sufficient detail as to its expenditures to Happy's Super Service and Spring Valley City Bank. The Board determined that the complaint was filed on justifiable grounds and ordered the Committee to file amended reports.

¶ 8        Following the Board's order, the Committee sought a stay of the case so that Mautino would not have to choose to claim or waive the protection of his fifth amendment right against self-incrimination in the proceeding before the Board due

to a pending, parallel federal criminal investigation.[5] Ultimately, the Committee's motion was denied, and the Committee was given until July 25, 2016, to file the amended reports. The Committee did not file the amended reports as ordered. Instead, the Committee filed another motion to stay, which was again denied by the Board.

¶ 9                                       Public Hearing

¶ 10       The matter proceeded to a public hearing. Of note, the hearing officer stated that the purpose of the public hearing was limited to determining whether the Committee justifiably declined to file the amended reports. Cooke objected to confining the public hearing to that issue only. Nonetheless, the parties presented evidence and testimony that went to the merits of Cooke's complaint, *i.e.*, whether the Committee had violated sections 9-8.10(a)(2) and 9-8.10(a)(9). Specifically, the deposition testimony of the Committee's treasurer, Patricia Maunu, was presented.[6] Other evidence included reports detailing the Committee's contributions and expenditures and a December 14, 2012, letter to the Committee from a Board staff member, which sought clarification regarding a quarterly report as to expenditures for gas, travel expenses, expenses for a golf outing, and expenses for a county fair booth.

¶ 11       Relevant here, the Board found that, because the Committee's records prior to 2014 had been destroyed pursuant to statute, the Committee had not willfully violated its May 18, 2016, order to amend those reports. The Board also determined, however, that the Committee had willfully violated its May 18, 2016, order to the extent that it did not amend the disclosure reports filed in 2014 and 2015 to reflect an accurate breakdown between gas and repairs made at Happy's Super Service, identify the actual recipient of each itemized expenditure made to Happy's Super Service, and identify the specific purpose of any expenditures made to Spring

---

[5] In written correspondence between the Board's general counsel and the United States Attorney's office, the latter would not confirm the existence of a parallel federal criminal investigation.

[6] A subpoena for deposition was not issued for Mautino based on his declaration that, in the event he was subpoenaed, he would assert his fifth amendment privilege. See U.S. Const., amend. V.

Valley Community Bank. The Board assessed the Committee a civil penalty in the amount of $5000. See *id.* § 9-26.[7]

¶ 12     Cooke filed a motion to reconsider, which argued that the Board should have addressed the merits of his complaint. After holding a hearing, the Board denied Cooke's motion to reconsider by a 4 to 4 vote and subsequently issued a written order.

¶ 13                         Remand by Appellate Court

¶ 14     Cooke appealed the Board's final order to the appellate court. See 10 ILCS 5/9-22 (West 2016). The appellate court remanded the matter to the Board for further proceedings, *i.e.*, to address and issue a ruling on the merits of Cooke's complaint. *Cooke*, 2018 IL App (4th) 170470, ¶ 95.

¶ 15     Upon remand, the parties filed briefs, but no new evidence was submitted. Cooke argued that section 9-8.10(a)(9) prohibits expenditures for gas and repairs of a vehicle unless the vehicle is owned or leased by the committee and is used primarily for campaign purposes or for the performance of governmental duties. Because the Committee had paid Happy's Super Service directly for gas and repairs of personal vehicles, Cooke argued that the Committee had violated this section.

¶ 16     The Committee's position was that section 9-8.10(a)(9) was modified by section 9-8.10(c) (10 ILCS 5/9-8.10(c) (West 2014)) and thus it was permissible for a committee to directly pay for gas and repairs of personal vehicles when those expenses were incurred in connection with the personal vehicles' use for campaign and governmental purposes.[8]

¶ 17     As to section 9-8.10(a)(2), Cooke asserted that the way the Committee had made expenditures at Happy's Super Service and Spring Valley City Bank inevitably allowed for money to be used for personal purposes such that the Committee received nothing in exchange. For example, Cooke contended that,

---

[7]$5000 is the maximum fine under this provision.
[8]The Committee also argued that Cooke failed to show a knowing violation of section 9-8.10(a)(9). The Committee does not present argument on this issue in its briefs to this court.

because the Committee was filling up individuals' gas tanks, there was no way to ensure that all the gas would be used for campaign or governmental purposes.

¶ 18    Additionally, Cooke maintained that the Committee violated section 9-8.10(a)(2) because it cashed checks to Spring Valley City Bank in whole dollar amounts and never returned any cash. Cooke contended that it was "implausible" Mautino could know in advance of his travel what his travel expenditures would be and that the travel expenses inevitably cost less than the amount withdrawn. Further, Cooke asserted that Mautino could not say that he took less cash than what he spent because he would have been required to disclose such costs as a campaign contribution. Mautino never did so.

¶ 19    The Committee countered that the evidence did not show that it had paid more than the fair market value for the gas or repairs at Happy's Super Service or for the expenses it paid for with the funds withdrawn from Spring Valley City Bank. The Committee also defined "fair market value" as "the price a reasonable person would pay to purchase an item or service that is also charged to other people."

¶ 20                    July 10, 2018, Special Meeting of the Board

¶ 21    The Board held a special meeting on July 10, 2018. Cooke and the Committee presented oral argument as to the merits of Cooke's complaint.

¶ 22    The Board first addressed section 9-8.10(a)(9). Member Carruthers asked the Committee whether section 9-8.10(c) allowed an officeholder to "spend money for essentially what they want to defray their expenses." In example, Carruthers inquired whether an officeholder could pay a vendor directly for personal vehicle expenses instead of providing reimbursement for actual mileage. The Committee responded: "[t]hat is one way to do it, yes." Carruthers disagreed and stated he believed that section 9-8.10(a)(9) only permitted a committee to pay directly for vehicle expenses that it owned or leased. The Committee contended that section 9-8.10(a)(9) was not the exclusive provision dealing with vehicle expenditures because it provided that a political committee "may" reimburse for mileage. Carruthers did not agree.

¶ 23      Member Linnabary inquired whether section 9-8.10(c) would allow a committee to make expenditures for non-officeholders. Linnabary suggested that the plain language of section 9-8.10(c) only permitted expenditures for an officeholder. In response, the Committee asserted that, as long as the expenditures were for campaign or governmental purposes, a committee could make expenditures for non-officeholders. Thus, according to the Committee, it had properly paid for repairs to Mautino's personal vehicles, which were used for campaign or governmental purposes. Chairman Cadigan added that he believed that section 9-8.10(a)(9) was the exclusive provision for vehicle expenditures and that section 9-8.10(c) applied to expenditures for things like job fairs and community events.

¶ 24      Member Linnabary agreed with Chairman Cadigan and Member Carruthers. Linnabary noted how it would be difficult to accurately determine whether vehicle repairs stemmed from personal use of the vehicle or for campaign purposes. Carruthers opined that this was why section 9-8.10(a)(9) did not allow a committee to make direct expenditures for vehicle repairs that the committee did not own or lease.

¶ 25      In contrast, Member McGuffage believed that section 9-8.10(a)(9) regulated repairs if the vehicle was owned or leased by the committee. In further contrast from Chairman Cadigan and Members Carruthers and Linnabary, McGuffage opined that section 9-8.10(c) was a "catch-all *** to pick up things that might not have been covered specifically in the foregoing sections." McGuffage further stated: "the only provision here is if you own or lease the vehicle; otherwise it doesn't cover it in this second or third sentence in sub 9, but I think it's picked up in subsection c." In example, McGuffage explained that, "if your battery dies, you got to go get it replaced, and if you're doing campaign work, it's a necessity." McGuffage also concluded that Cooke had not shown that the expenditures for gas and repairs at Happy's Super Service were for personal purposes. Carruthers expressed his belief that "the fact the expenditures were made period is a violation."

¶ 26      Next, the Board addressed section 9-8.10(a)(2). With regard to the expenditures reported to Spring Valley City Bank, Chairman Cadigan stated that he believed that Cooke had met his burden as to the cash used for travel expenses. Member Carruthers agreed. Cadigan noted that the cash was obtained prior to travel, the cash

was taken out in whole dollar amounts, Mautino would sometimes not submit receipts after his travel, he did not return any excess cash after traveling, and he did not seek additional cash for unanticipated travel expenses after the fact.

¶ 27        Members Scholz and McGuffage, however, noted the lack of evidence in light of the Committee's inadequate reporting. McGuffage admitted the suspicious nature of the reported expenditures being in whole dollar amounts but explained that, without the amended reports, he could not determine which expenditures were campaign-related or which were personal.

¶ 28        Member Linnabary asked:

"[I]f Representative Mautino took a disbursement from the [Committee] for $200 and then spent $170 on reimbursable expenses, so, therefore, took more money than he had expenses and didn't refund that money to the [C]ommittee, can we all agree that that would be an expenditure to Representative Mautino in excess of the fair market value?"

¶ 29        Vice Chairman Keith did not agree, explaining:

"I can't agree with that because we don't know what happened to that $30. It could be—I mean, we're all just speculating. That's the problem. Because Chicago may have been $170, and on the way home, he may have stopped *** [and] met with a county chairman and picked up the tab for $30. We don't know."

¶ 30        Later in the meeting, Member Carruthers entered as a Board exhibit Mautino's March 6, 2017, declaration that, if subpoenaed to testify at a deposition, he would assert his fifth amendment privilege. Citing case law, Carruthers suggested that the Board was able to draw a negative inference from Mautino's refusal to testify. Cooke argued in favor of such an inference because Mautino was the one who spent the money withdrawn from the bank. The Committee, on the other hand, argued against such an inference and noted that Maunu had testified that Mautino brought back receipts following his travel. Member Linnabary suggested that "consequences" should follow where an officeholder writes checks to himself, takes the cash, and then fails to always return receipts. Member McGuffage argued

against drawing a negative inference due to a possible ongoing federal investigation.

¶ 31 Member Carruthers made a motion to find that

"[Cooke] has met [his] burden of proof by the preponderance of the evidence and that the [Committee] violated [s]ection [9-]8.10(a)(9) by making expenditures for the maintenance and repair and gas of motor vehicles that were neither owned nor leased by the [C]ommittee, and that should the motion pass, we deliberate as to the amount of the fine."

Chairman Cadigan and Members Carruthers, Linnabary, and O'Brien voted in favor of the motion. Vice Chairman Keith and Members McGuffage, Scholz, and Watson voted against the motion. The Board's general counsel directed the members to explain their votes.

¶ 32 Chairman Cadigan and Members Carruthers, Linnabary, and O'Brien agreed that Cooke had met his burden of proof because any expenditure for gas and repairs on a vehicle that a Committee does not own or lease was a violation of section 9-8.10(a)(9). However, Vice Chairman Keith and Members McGuffage, Scholz, and Watson had all declined to find that Cooke had met his burden of proof due to the lack of sufficient evidence in the record.

¶ 33 Next, Member Carruthers made a motion to find that

"[Cooke] has met [his] burden of proof by a preponderance of the evidence and that the [Committee] violated [s]ection [9-]8.10(a)(2) by making expenditures clearly in excess of fair market value for the goods and services received by the [C]ommittee, by making expenditures for gas and repairs for personal vehicles rather than reimbursing them on the mileage rate, and by withdrawing funds from the bank in whole dollar amounts that were purportedly used for campaign expenses without returning any cash. And that if the motion should pass, we deliberate as to the amount of the fine."

Again, only Chairman Cadigan and Members Carruthers, Linnabary, and O'Brien cast their votes in favor of the motion. The Board's general counsel directed the members to explain their votes.

¶ 34    Member Carruthers explained that he relied in part on an adverse inference drawn from Mautino's refusal to testify to conclude that Cooke had demonstrated that at least a part of the expenditures for gas, repairs, and travel expenses was used for personal purposes. As a result, Carruthers believed that the Committee had paid more than the fair market value for what it had received in return. Chairman Cadigan and Members Linnabary and O'Brien agreed with Member Carruthers's reasoning. Vice Chairman Keith voted against the motion based on the explanation he gave before, *i.e.*, the lack of sufficient evidence, and because he opted not to draw an adverse inference from Mautino's refusal to testify. Member McGuffage shared in Vice Chairman Keith's reasoning and stated that "[t]here's no evidence to conclusively show that fair market value was clearly exceeded." Members Scholz and Watson agreed with Keith and McGuffage's reasoning.

¶ 35                          The Board's Final Order on Remand

¶ 36    The Board issued a written final order, which reflected the following:

"1. Based on the failure of the Board to achieve 5 votes upon motions to find that [Cooke] has met the burden of proof the find that:

a) [The Committee] violated [s]ection 5/9-8.10(a)(2), and

b) [The Committee] violated [s]ection 5/9-8.10(a)(9),

the Board does not find that [the Committee] violated either of said Sections; and

2. The effective date of this Order is July 16, 2018; and

3. This is a Final Order subject to review under the Administrative Review Law and [s]ection 9-22 of the Election Code."

Cooke sought judicial review of the Board's decision. See 10 ILCS 5/9-22 (West 2016).

¶ 38    The appellate court recognized that review of the Board's decision required interpreting the statutory language of both sections 9-8.10(a)(2) and 9-8.10(a)(9) and a review of the Board's application thereof. See 2019 IL App (4th) 180502, ¶ 52. First, the court observed that the Board appeared to have split on its interpretation of section 9-8.10(a)(9). *Id.* ¶ 64. In support, the court noted that the four members who voted in favor of finding a violation deemed section 9-8.10(a)(9) to be the exclusive provision governing campaign expenditures for vehicles and thus concluded that any expenditure for gas and repairs of a vehicle that was not owned or leased by the committee was a violation of that section. *Id.* The court surmised that the other four Board members apparently believed that section 9-8.10(c) in some way provided for a committee to make direct expenditures for gas and repairs of a personal vehicle that was used for campaign or governmental purposes. *Id.* Ultimately, the appellate court held that section 9-8.10(a)(9) "is the exclusive provision regulating campaign expenditures on vehicles and does not permit, and therefore effectively prohibits, any expenditure to a third party for gas and repairs of vehicles neither owned nor leased by a committee." *Id.* ¶ 68.

¶ 39    Based on its interpretation of section 9-8.10(a)(9), the appellate court found the Board's decision failing to find a violation thereof clearly erroneous and reversed. *Id.* ¶ 80. The appellate court cited that evidence presented at the public hearing showed the Committee "(1) did not own or lease any vehicles and (2) made expenditures to Happy's for gas and vehicle repairs." *Id.*

¶ 40    As to section 9-8.10(a)(2), the appellate court noted that, during the special meeting, the Board seemed to agree that that section regulated not only the amount of an expenditure but also the purpose for which it is used. *Id.* ¶ 71. Although Vice Chairman Keith ultimately voted against finding a violation, the court noted that his response to the question posed by Member Linnabary that he would have to know what happened to the $30 suggested that he also believed that the purpose of an expenditure is relevant under section 9-8.10(a)(2). *Id.* The court noted that Member McGuffage, who also voted against the motion, likewise appeared to believe that the purpose is pertinent based on his statement that without amended reports he could not determine " 'which was campaign expenditures, which was personal expenditures.' " *Id.*

¶ 41 Before the appellate court, however, the Committee and the Board asserted that section 9-8.10(a)(2) regulates only the amount of an expenditure and not its purpose. *Id.* ¶ 72. The court disagreed, concluding:

"As Cooke argues, the plain language of section 9-8.10(a)(2) does not regulate only the amount of a specific expenditure. An expenditure for a particular item or service used for an improper purpose would be an expenditure clearly in excess of the fair market value of what the committee received in exchange, which would be nothing. This interpretation makes sense. It prohibits committees from paying market value for a particular item or service and then allowing that item or service to be used for a purpose unrelated to campaign or governmental duties.

We find section 9-8.10(a)(2) regulates not only the amount but also the purpose for which an expenditure is used." *Id.* ¶¶ 72-73.

¶ 42 The appellate court reversed the Board's findings that Cooke did not establish section 9-8.10(a)(2) violations based on expenditures for gas and repairs at Happy's Super Service and expenditures to Spring Valley City Bank for travel expenses. *Id.* ¶¶ 84-85.

¶ 43 As to the gas and repairs, the appellate court explained:

"As Cooke argues, we find it would be inevitable at least some portion of the gas and repairs were for personal use. Cooke established it is more probably true than not that the Committee made expenditures for gas and repairs for personal purposes. By making expenditures for gas and repairs for personal purposes, the Committee made expenditures in excess of the fair market value for what it received in exchange, which was nothing. The Board's decision to the contrary is clearly erroneous. We note, had the Committee made expenditures for personal vehicle use in the manner authorized by section 9-8.10(a)(9), the Committee would have likely avoided any violations of section 9-8.10(a)(2), as reimbursements at a rate not to exceed the standard mileage rate method for computation of business expenses under the Internal Revenue Code effectively serves as a fair-market-value protection." *Id.* ¶ 84.

¶ 44 Next, the appellate court concluded that

"[t]he evidence showed (1) the cash was obtained prior to travel by Mautino, (2) the cash was obtained in whole dollar amounts, (3) Mautino would sometimes not return receipts after traveling, (4) the Committee's treasurer did not recall an instance where Mautino deposited cash with the Bank when he returned from travel with receipts for expenses totaling an amount less than the amount of cash previously obtained from the Bank, (5) Mautino did not seek additional cash for unexpected traveling expenses, and (6) Mautino did not disclose any contributions relating to his personal payment of unexpected traveling expenses. Without needing to consider any possible adverse inference from Mautino's refusal to testify, we find the manner in which the Committee paid for travel expenses over a 15-year period inevitably led to at least some portion of the cash being used for personal purposes. By making expenditures to withdraw cash used for personal purposes, the Committee made expenditures in excess of the fair market value for what it received in exchange, which was nothing. The Board's decision to the contrary is clearly erroneous." *Id.* ¶ 85.

¶ 45　　Finally, the appellate court remanded the case to the Board to "address whether the violations were knowingly committed in considering the matter of fines under section 9-8.10(b)." *Id.* ¶ 87.

¶ 46　　This court granted the Committee's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019).

¶ 47　　　　　　　　　　　　　　　ANALYSIS

¶ 48　　At issue are several subsections of article 9 of the Code. Article 9 governs the disclosure and regulation of campaign contributions and expenditures. Although this case is before this court following review in the appellate court, we are reviewing the Board's decision and not that of the appellate court. See, *e.g.*, *Jackson-Hicks v. East St. Louis Board of Election Commissioners*, 2015 IL 118929, ¶ 19. Pursuant to article III, section 5, of the Illinois Constitution of 1970, the Board has general supervision of Illinois's election laws. *Lunding v. Walker*, 65 Ill. 2d 516, 526 (1976). Section 1A-7 of the Code provides that "[f]ive members of the Board are necessary to constitute a quorum and 5 votes are necessary for any action of the Board to become effective." 10 ILCS 5/1A-7 (West 2018).

¶ 49    "This court views an electoral board as an administrative agency." *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 209 (2008) (citing *Kozel v. State Board of Elections*, 126 Ill. 2d 58, 68 (1988)). Judicial review of the Board's decision is governed by the Administrative Review Law. See 10 ILCS 5/9-22 (West 2016); 735 ILCS 5/3-110 (West 2018) (stating in part that "[t]he hearing and determination shall extend to all questions of law and fact presented by the entire record"); see also *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 240 (2009).

¶ 50    "The applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law." *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005) (citing *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001)). As to the Board's application of the statute to the facts, the parties agree that the standard of review is clear error. "An agency's application of a rule of law to established facts is a mixed question of fact and law that will not be reversed unless it is deemed 'clearly erroneous.' " *Cook County Republican Party*, 232 Ill. 2d at 243-44 (quoting *Cinkus*, 228 Ill. 2d at 211). "The standard of review is deferential, providing for reversal only when the reviewing court has a definite and firm conviction that a mistake has been made." *Id.* at 245.

¶ 51    First, however, we must interpret the relevant statutory provisions before addressing the Board's application thereof. An issue of statutory interpretation presents a pure question of law subject to *de novo* review. See *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 398 (1994) (observing that "a court is not bound by an administrative agency's interpretation of a statute"); see also *Jackson-Hicks*, 2015 IL 118929, ¶ 20 ("Where, as here, historical facts are admitted or established and the only dispute concerns whether the governing legal provisions were interpreted correctly by election officials, the case presents a purely legal question for which our review is *de novo*, a standard we have characterized as 'independent and not deferential.' " (quoting *Goodman v. Ward*, 241 Ill. 2d 398, 406 (2011)). "When determining how the Election Code should be construed, we employ the same basic principles of statutory construction applicable to statutes generally." *Jackson-Hicks*, 2015 IL 118929, ¶ 21.

¶ 52    "The fundamental rule of statutory interpretation is to ascertain and give effect to the legislature's intent, and the best indicator of that intent is the statutory language, given its plain and ordinary meaning." *Dew-Becker v. Wu*, 2020 IL 124472, ¶ 12. The statute must be viewed as a whole, and as such, this court construes words and phrases not in isolation but relative to other pertinent statutory provisions. *State ex rel. Leibowitz v. Family Vision Care, LLC*, 2020 IL 124754, ¶ 35. "No part of a statute should be rendered meaningless or superfluous." *Rushton v. Department of Corrections*, 2019 IL 124552, ¶ 14. We likewise keep in mind the subject addressed by the statute and the legislature's apparent intent in enacting it. *People ex rel. Madigan v. Wildermuth*, 2017 IL 120763, ¶ 17. Here, "[t]he statutory scheme is intended to preserve the integrity of the electoral process by requiring full public disclosure of the sources and amounts of campaign contributions and expenditures." *Sorock v. Illinois State Board of Elections*, 2012 IL App (1st) 112740, ¶ 2 (citing *Walker v. State Board of Elections*, 72 Ill. App. 3d 877, 881 (1979)).

¶ 53                    Interpretation of Section 9-8.10(a)(9)

¶ 54    We begin our analysis by interpreting section 9-8.10(a)(9). Section 9-8.10(a)(9), "Use of political committee and other reporting organization funds" provides:

   "(a) A political committee shall not make expenditures:

                                * * *

   (9) For the purchase of or installment payment for a motor vehicle unless the political committee can demonstrate that purchase of a motor vehicle is more cost-effective than leasing a motor vehicle as permitted under this item (9). A political committee may lease or purchase and insure, maintain, and repair a motor vehicle if the vehicle will be used primarily for campaign purposes or for the performance of governmental duties. A committee shall not make expenditures for use of the vehicle for non-campaign or non-governmental purposes. Persons using vehicles not purchased or leased by a political committee may be reimbursed for actual mileage for the use of the vehicle for campaign purposes or for the

- 15 -

performance of governmental duties. The mileage reimbursements shall be made at a rate not to exceed the standard mileage rate method for computation of business expenses under the Internal Revenue Code." 10 ILCS 5/9-8.10(a)(9) (West 2016).

¶ 55 The Committee maintains that section 9-8.10(a)(9) is limited to prohibiting only certain uses of personal vehicles rather than all expenditures on vehicles owned by individuals working or volunteering for the campaign. In support, the Committee notes that the statute singularly prohibits "expenditures for use of the vehicle for non-campaign or non-governmental *purposes*." (Emphasis added.) *Id.* Accordingly, the Committee argues that the appellate court's interpretation impermissibly expanded the prohibitions in section 9-8.10(a)(9) beyond the plain language of the statute. See *Rosewood Care Center, Inc. v. Caterpillar, Inc.*, 226 Ill. 2d 559, 567 (2007) ("We may not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent."). According to the Committee, it is the legislature's intent that committees be allowed to make expenditures on vehicles used for campaign purposes. The Committee highlights the following language from section 9-8.10(a)(9): "[a] political committee may . . . insure, maintain, and repair a motor vehicle if the vehicle will be used primarily for campaign purposes or for the performance of governmental duties." See 10 ILCS 5/9-8.10(a)(9) (West 2016).

¶ 56 We disagree. The plain language of section 9-8.10(a)(9) lays out three possible scenarios relating to a vehicle that is used for campaign or governmental purposes that the committee happens to (1) own, (2) lease, or (3) not own or lease. Subsection (9) contains five sentences. The first sentence makes clear that a committee may only purchase or make a payment for "a motor vehicle" if doing so is more cost-effective than leasing. *Id.*

¶ 57 The second sentence provides that a committee may purchase or lease a vehicle "if the vehicle will be used primarily for campaign purposes or for the performance of governmental duties" and details the types of expenditures that may be made in connection therewith. *Id.* Specifically, a committee may "insure, maintain, and repair" the purchased or leased vehicle. *Id.* The third sentence prohibits a committee from making expenditures "for use of the vehicle for non-campaign or non-governmental purposes." *Id.* Use of the term "the vehicle" in the third sentence

makes clear that the sentence is still referring to a vehicle that the committee owns or leases and uses primarily for campaign purposes or for governmental duties. Accordingly, the second and third sentences make clear that, for a committee to permissibly make an expenditure for insurance, maintenance, or repairs, the committee must either own or lease the vehicle and have the expenditure stem from the committee's use of the vehicle for campaign or governmental purposes.

¶ 58    In contrast, the final two sentences of section 9-8.10(a)(9) govern the situation where a vehicle used for campaign or governmental purposes is neither owned nor leased by the committee. In fact, after the first three sentences discuss vehicles that are purchased or leased by a committee, the fourth sentence explicitly addresses the scenario where "[p]ersons [are] using vehicles not purchased or leased by a political committee." These final two sentences provide that a committee "may" reimburse the person using such vehicles for actual mileage and that such reimbursement shall not exceed the standard mileage rate method for computation of business expenses under the Internal Revenue Code when the person uses their vehicle "for campaign purposes or for the performance of governmental duties." *Id.*

¶ 59    The Committee asserts that the legislature's use of the word "may" is permissive and that this provision therefore "simply confers a benefit on an individual using his or her car for campaign or governmental purposes" and "does not say that a political committee may only make expenditures on vehicles used for campaign purposes if they are in the form of reimbursements for actual mileage." Nothing in the language of "the reimbursement provision," according to the Committee, limits a committee's expenditures pertaining to vehicles owned by individuals working for the campaign. Otherwise, the Committee asserts that the legislature would have stated that the use of such vehicles "may only" or "shall" be reimbursed for mileage reimbursements.

¶ 60    We reject the Committee's position as incompatible with the plain language of the statute, which exhaustively delineates what types of expenditures may be made for a vehicle used for campaign or governmental purposes when a committee owns, leases, or does not own the vehicle. Furthermore, we note that the plain language does not even mention the word "gasoline"—the Committee apparently assumes, without providing argument, that expenditures for "maintenance" of a vehicle would cover gasoline costs. Because we do not find that section 9-8.10(a)(9)

permits expenditures for vehicles not owned or leased by a committee beyond actual mileage reimbursement, we need not address this unbriefed issue.

¶ 61 Still, the Committee argues that Cooke and the appellate court failed to consider the impact of section 9-8.10(c),[9] which provides: "Nothing in this Section prohibits the expenditure of funds of a political committee controlled by an officeholder or by a candidate to defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions." *Id.* § 9-8.10(c); see also *Knolls Condominium Ass'n v. Harms*, 202 Ill. 2d 450, 459 (2002) ("Statutes relating to the same subject must be compared and construed with reference to each other so that effect may be given to all of the provisions of each if possible."). According to the Committee, section 9-8.10(c) essentially modifies section 9-8.10(a)(9) and further supports the conclusion that the legislature intended that committees be allowed to spend money on personal vehicles used for campaign or governmental purposes.

¶ 62 We reject this argument. "It is a well-settled rule of statutory construction that [w]here there are two statutory provisions, one of which is general and designed to apply to cases generally, and the other is particular and relates to only one subject, the particular provision must prevail." (Internal quotation marks omitted.) *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 233 (2007). Section 9-8.10(a)(9) specifically addresses expenditures relating to vehicles, whereas section 9-8.10(c) makes no such mention and generally refers to expenditures that "defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions." Accordingly, section 9-8.10(c) cannot be read as a *carte blanche* provision that trumps section 9-8.10(a)(9).

---

[9]In the report of proceedings of the Board's July 10, 2018, special meeting, the attorney for the Committee stated that subsection "(A)(9) only deals with reimbursement for gas" and that "Section (c) deals with [t]he repair issue." Before this court, the Committee does not specify whether section 9-8.10(c) modifies section 9-8.10(a)(9) with regard to repairs only. In its reply brief, relating to section 9-8.10(a)(2), the Committee asserts that "Subsection 9 does not discuss the purchase of fuel or repairs for vehicles not owned by a committee. That silence, however, does not preclude these expenditures. Instead, they are governed by subsection 2, and 6." We take the Committee's argument to be that section 9-8.10(c) modifies section 9-8.10(a)(9) with regard to the expenditures for both the gas and repairs.

¶ 63        We add that, in construing and comparing the various subsections of section 9-8.10, it is evident that the legislature was purposeful in designating "who" is or is not eligible for a committee to make expenditures to or on behalf of, in different contexts. Section 9-8.10(a), for example, refers to "the committee," "the public official or candidate" (10 ILCS 5/9-8.10(a)(3) (West 2016)), "any person" (*id.* § 9-8.10(a)(6), (a)(8)), "[p]ersons using vehicles not purchased or leased by a political committee" (*id.* § 9-8.10(a)(9)), and a public official's or candidate's "family member" (*id.* § 9-8.10(a)(11)). Paragraph (c), however, refers specifically to the "customary and reasonable expenses *of an officeholder.*" (Emphasis added.) *Id.* § 9-8.10(c). Thus, section 9-8.10(c) would have no application, for example, to gas purchased for a volunteer's or non-officeholder's use of his or her personal vehicle in the performance of campaign or governmental purposes. Were we to accept the Committee's position, we would be unduly broadening the meaning of the word "officeholder." The Committee had two officeholders: Mautino and Maunu. Further, it would not excuse the expenditures for gas given to other individuals who Maunu testified worked for the campaign.[10] Additionally, section 9-8.10(c), unlike section 9-8.10(a)(9), does not permit expenditures made in connection with "campaign purposes" but for "customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions." The Committee provides no explanation as to why these terms should be construed interchangeably.

¶ 64        The fact that Mautino was an officeholder, however, would not mean the Committee could find shelter in section 9-8.10(c) for the expenditures for repairs to Mautino's personal vehicles. As detailed above, section 9-8.10(a)(9) is the exclusive provision dealing with vehicle expenditures and explicitly refers to "repairs." Accepting the Committee's argument that section 9-8.10(c) modifies section 9-8.10(a)(9) would impermissibly render this portion of section 9-8.10(a)(9) superfluous as well as the final two sentences, which singularly permit actual mileage reimbursement for vehicles that are not owned or leased by a committee. See 2019 IL App (4th) 180502, ¶ 66; see also *Policemen's Benevolent Labor Committee v. City of Sparta*, 2020 IL 125508, ¶ 21.

---

[10]These individuals include but are not limited to Mautino's wife, son, daughter, and nephew, as well as Maunu's husband and niece.

¶ 65 Both Cooke and the appellate court observed that the legislature only authorized mileage reimbursement for vehicles not owned or leased by a committee because "[m]ileage reimbursement (1) assures an individual is only compensated for fuel and associated wear and tear from the use of a personal vehicle for campaign or governmental purposes and (2) creates transparent and detailed records of use of committee funds." 2019 IL App (4th) 180502, ¶ 67. The Committee argues that mileage reimbursements are not a measure of actual expenses but are instead an estimate of the cost of travel that is permitted to be paid pursuant to federal tax laws. The Committee is attempting to make the point that the legislature was not concerned with exactly compensating third parties or volunteers. In turn, then, the logic against permitting expenditures for gas and repairs, which may not be able to be perfectly attributed to use of a vehicle for personal purposes or campaign or government purposes, does not hold.

¶ 66 To illustrate the logic of its position, the Committee provides a hypothetical. At present, the Internal Revenue Service (IRS) limit for mileage reimbursement is $0.56 per mile. See Internal Revenue Serv., *2021 Standard Mileage Rates*, https://www.irs.gov/pub/irs-drop/n-21-02.pdf (last visited Apr. 22, 2021) [https://perma.cc/B38W-A89H]. The Committee posits that it could thus pay up to $56 for 100 miles of travel. However, if the Committee instead provided 10 gallons of gasoline to a volunteer, at $3 per gallon, the Committee would only spend $30. Therefore, "[w]hile the vehicle may get more fuel than needed to drive 100 miles, the cost to the committee is less, and it guarantees the volunteer or staffer can complete the work they are traveling to perform without running out of fuel." Our interpretation, according to the Committee, leads to the absurd result whereby a political committee will be unable to reimburse volunteers for any vehicle costs incurred on the campaign trail except for base mileage reimbursement. As a result, the Committee argues that there will be a chilling effect on a committee's ability to retain volunteers. Specifically, fewer people will be willing to assist in campaigns if they must pay for their own gas and repairs when doing so.

¶ 67 Interestingly, not only is this argument contrary to the plain language of section 9-8.10(a)(9), as detailed above, the scenario set forth by the Committee undermines its latter contention that committees will be hard-pressed to find volunteers. If a volunteer may theoretically receive more money or compensation by way of "base mileage reimbursement" than for a whole tank of gas, there may be more

- 20 -

motivation for people to volunteer to work on campaigns. Nevertheless, section 9-8.10(a)(9) states that "[t]he mileage reimbursements shall be made at a rate *not to exceed* the standard mileage rate method for computation of business expenses under the Internal Revenue Code." (Emphasis added.) 10 ILCS 5/9-8.10(a)(9) (West 2016). A committee, therefore, may reimburse an individual at a rate less than $0.56 per mile.

¶ 68 Regardless, we have been presented with no citation of statutes or case law providing that a committee may concoct its own compensation system if it may theoretically be more economically feasible for the committee or attractive to volunteers than the one provided in the plain language of the governing statute. This argument is better directed to the legislature.

¶ 69 Finally, in its reply brief, the Committee adds that our interpretation would run contrary to the legislature's intention in enacting section 9-8.10(a)(9), which purportedly was to discourage committees from purchasing or leasing vehicles. We discern no such intent from the plain language of the statute, and the Committee provides no citation to support this assertion. We therefore entertain it no further.

¶ 70 Accordingly, section 9-8.10(a)(9), which is the exclusive provision dealing with vehicle-related expenditures, does not permit a committee to make expenditures other than for actual mileage reimbursement for vehicles that are not owned or leased by a committee. Nor does section 9-8.10(c). We now consider whether the Board's application of section 9-8.10(a)(9) was clearly erroneous.

¶ 71                              Application of Section 9-8.10(a)(9)

¶ 72 As detailed above, pursuant to section 9-8.10(a)(9), with regard to a vehicle neither owned nor leased by a committee, the committee may only make expenditures for actual mileage reimbursement when that vehicle is used for campaign or governmental purposes. As observed by the appellate court, Maunu's deposition testimony established that the committee did not lease or own a vehicle, yet the Committee had made expenditures to Happy's Super Service for gas and also for repairs to Mautino's personal vehicles. Cooke presented several exhibits showing receipts from Happy's Super Service for such expenditures. Accordingly, the Board's failure to find a violation of this section was clearly erroneous. As

- 21 -

counsel for the Committee conceded at oral argument, our interpretation of section 9-8.10(a)(9) clearly dictates finding that the Committee violated section 9-8.10(a)(9).

¶ 73                    Interpretation of Section 9-8.10(a)(2)

¶ 74        Next, we interpret the language of section 9-8.10(a)(2). Section 9-8.10(a)(2) provides:

> "(a) A political committee shall not make expenditures:
>
> ***
>
> (2) Clearly in excess of the fair market value of the services, materials, facilities, or other things of value received in exchange." *Id.* § 9-8.10(a)(2).

¶ 75        The Committee asserts that section 9-8.10(a)(2) limits only the *amount* of specific expenditures and complains that the appellate court read in a "purpose" requirement that the legislature did not provide. See 2019 IL App (4th) 180502, ¶ 73 (finding that section 9-8.10(a)(2) also regulates "the purpose for which an expenditure is used"); see also *id.* ¶ 72 (observing that "[a]n expenditure for a particular item or service used for an improper purpose would be an expenditure clearly in excess of the fair market value of what the committee received in exchange, which would be nothing").

¶ 76        The Code does not define "fair market value," but the Committee proffers the following definition derived from case law: "the price a willing buyer would pay a willing seller for goods, services, or property." The Committee sources this definition from cases dealing with property taxes or the specific performance of an option to purchase real estate (see *Bloomington Public Schools, District No. 87 v. Illinois Property Tax Appeal Board*, 379 Ill. App. 3d 387, 389 (2008) (citing *Residential Real Estate Co. v. Illinois Property Tax Appeal Board*, 188 Ill. App. 3d 232, 242 (1989)); *Kane v. McDermott*, 191 Ill. App. 3d 212, 219 (1989) (citing Black's Law Dictionary 537 (5th ed. 1979)).

¶ 77        Cooke argues that the appellate court properly interpreted section 9-8.10(a)(2). The appellate court's interpretation, according to Cooke, is sensible because it

prohibits committees from paying market value for an item, for example, and then allowing that item to be used for noncampaign or nongovernmental purposes. Cooke asserts that his and the appellate court's interpretation does not depend solely on the definition of "fair market value" and instead incorporates the entire phrase that "a committee may not make expenditures clearly in excess of the fair market value of the services, materials, facilities, or other things of value received in exchange." See 10 ILCS 5/9-8.10(a)(2) (West 2016). Also, Cooke refers to case law from other states (see *State ex rel. Washington State Public Disclosure Comm'n v. Permanent Offense*, 150 P.3d 568, 574-75 (Wash. Ct. App. 2006); *Texas Ethics Comm'n v. Goodman*, No. 2-09-094-CV, 2010 WL 323544 (Tex. Ct. App. Jan. 28, 2010)) for the proposition that the fair market value provision has two purposes: (1) to ensure that a committee does not underreport its contributions by purchasing goods and services at less than their fair market value, as the difference between the low purchase price and the higher fair market value is a contribution to the committee, and (2) to ensure that a committee does not underreport its expenditures by overpaying for things, such that a vendor is unjustly enriched or a campaign associate illicitly pockets the difference and converts it to personal use. Specifically, Cooke asserts that the purported second purpose of the provision shows why section 9-8.10(a)(2) encompasses an expenditure's purpose—by paying for goods or services a committee cannot use, the committee is overpaying and unjustly enriching the third party who will instead use the goods and services.

¶ 78    Having set out the parties' positions, we now turn to the language of section 9-8.10(a)(2). As acknowledged by the Committee, the Code does not define "fair market value." In such a situation, we may look to the dictionary to discern an undefined term's plain and ordinary meaning. See *Barrall v. Board of Trustees of John A. Logan Community College*, 2020 IL 125535, ¶ 18.

¶ 79    Our review of the definitions of "market value" and "fair market value" leads us to conclude that the term "fair market value" does not encompass the purpose for which a "service[ ], facilit[y], or other thing[ ] of value received in exchange" is *ultimately* used. Webster's Third New International Dictionary 1383 (2014) (defining "market value" as "a price at which both buyers and sellers are willing to do business : the market or current price"); Black's Law Dictionary 1785 (10th ed.

2014) (defining "fair market value"[11] as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect").

¶ 80    Section 9-8.10(a)(2) is plainly focused on price or amount. Cooke's interpretation of section 9-8.10(a)(2) overemphasizes the language "received in exchange," such that "[c]learly in excess of the fair market value" would be read out of the provision in many instances. For example, if, under Cooke's reasoning, a committee purchased 10 gallons of gas priced at $3/gallon for a vehicle neither owned nor leased by the committee, the committee would be violating section 9-8.10(a)(2) even if it only paid $1/gallon. Essentially, the fair market value of gas would be of no moment. Still more, simply because the committee could not lawfully purchase gasoline for a vehicle it did not own or lease, it does not necessarily follow that the committee did not receive any value in exchange. This supposition is hypertechnical and strains the language of section 9-8.10(a)(2). Unlike other sections of section 9-8.10, section 9-8.10(a)(2) does not include the term "purpose."[12] Furthermore, though not integral to our analysis, we observe that Cooke's interpretation would lead to an automatic compounding of violations. Any time a committee made an unauthorized expenditure, it would be in violation of not only the subsection dealing with the type or category of expenditure but section 9-8.10(a)(2) as well.

¶ 81                            Application of Section 9-8.10(a)(2)

¶ 82    We now turn to the issue of the Board's application of section 9-8.10(a)(2). First, we address the Committee's expenditures for gas and repairs of noncampaign vehicles. As mentioned, the Board split on the issue of whether Cooke had

---

[11]This definition states that "fair market value" is also termed actual value, actual cash value, actual market value, cash value, clear market value, fair and reasonable value, fair cash market value, fair market price, full value, market value, salable value, and true value. See Black's Law Dictionary 1785 (10th ed. 2014).

[12]Cooke and the appellate court stress the point that, by interpreting section 9-8.10(a)(2) to include a purpose requirement, committees would be prohibited from paying market value for an item or service and then permitting that item to be used for an unauthorized purpose. In such a situation, it would not be the expenditure itself that would be problematic but the subsequent conduct of the individual(s) permitting the unauthorized use of the item and misappropriation of committee funds.

established that the Committee's expenditures for gas and repairs of personal vehicles violated section 9-8.10(a)(2). The appellate court, however, reversed the Board's finding based on its interpretation of section 9-8.10(a)(2) as encompassing a purpose requirement. Specifically, the court concluded:

> "The evidence established the Committee made expenditures to Happy's for gas and repairs of personal vehicles over a 15-year period. As Cooke argues, we find it would be inevitable at least some portion of the gas and repairs were for personal use. Cooke established it is more probably true than not that the Committee made expenditures for gas and repairs for personal purposes. By making expenditures for gas and repairs for personal purposes, the Committee made expenditures in excess of the fair market value for what it received in exchange, which was nothing." 2019 IL App (4th) 180502, ¶ 84.

Cooke urges this same finding.

¶ 83        Based on our determination that section 9-8.10(a)(2) is only concerned with the amount or price of an expenditure, we reject Cooke and the appellate court's reasoning. We also question the soundness of finding that the evidence showed that it was "inevitable" that some portion of the gas and repairs were for personal use. Although it may not be an outlandish assumption because these expenditures were made for personal vehicles, it is speculation, nonetheless.

¶ 84        The evidence before the Board included transcripts of Maunu's deposition testimony, several exhibits containing copies of receipts from Happy's Super Service for gas and repairs, and reports detailing the Committee's contributions and expenditures. Cooke did not present evidence demonstrating that, for example, the price per gallon paid by the Committee clearly exceeded the market price on the relevant date. Instead, Cooke relied on the peculiarity of whole dollar expenditures for gas, the fact that the gas was consistently purchased from Happy's Super Service, and the vast cumulative amount of those expenditures.

¶ 85        As detailed above, the focus must be upon whether the expenditures were clearly in excess of the fair market value, *i.e.*, price of gas and types of repairs. Simply, Cooke did not offer the Board a concrete point of comparison or reference for these expenditures. For this reason, Cooke did not meet his burden, and we are unable to find the Board's decision that Cooke did not show that the expenditures

for gas and repairs demonstrated a violation of section 9-8.10(a)(2) was clearly erroneous. Accordingly, we affirm this finding of the Board.

¶ 86    Next, we consider the propriety of the Board's finding that Cooke also failed to show that the Committee's expenditures to Spring Valley City Bank for travel expenses violated section 9-8.10(a)(2). Again, Cooke asserts that the appellate court correctly determined:

"[t]he evidence showed (1) the cash was obtained prior to travel by Mautino, (2) the cash was obtained in whole dollar amounts, (3) Mautino would sometimes not return receipts after traveling, (4) the Committee's treasurer did not recall an instance where Mautino deposited cash with the Bank when he returned from travel with receipts for expenses totaling an amount less than the amount of cash previously obtained from the Bank, (5) Mautino did not seek additional cash for unexpected traveling expenses, and (6) Mautino did not disclose any contributions relating to his personal payment of unexpected traveling expenses. Without needing to consider any possible adverse inference from Mautino's refusal to testify, we find the manner in which the Committee paid for travel expenses over a 15-year period inevitably led to at least some portion of the cash being used for personal purposes. By making expenditures to withdraw cash used for personal purposes, the Committee made expenditures in excess of the fair market value for what it received in exchange, which was nothing." *Id.* ¶ 85.

¶ 87    Again, because section 9-8.10(a)(2) is only concerned with the amount or price of an expenditure, we cannot accept Cooke and the appellate court's reasoning. We again reject the finding that the evidence showed that it was "inevitable" that some portion of the cash was used for personal purposes. Relevant here, when ordered to amend its reports to identify the specific purpose of any expenditures made to Spring Valley City Bank, the Committee refused. Thus, Cooke could not, for example, identify the actual recipient of the expenditure or compare the amount of money withdrawn from the bank with the travel costs Mautino purportedly incurred. [13] Instead, Cooke could only demonstrate the peculiarity of the

---

[13]Chairman Cadigan observed: "Round numbers in the absence of underlying documentation arouse suspicion. That's a common practice in investigating and uncovering fraud."

Committee and Mautino's method of reporting expenditures for certain travel expenses. Therefore, the Board was without the requisite information to determine whether it was more probably true than not that the Committee violated section 9-8.10(a)(2). All four of the members who voted in favor of finding a violation noted that they additionally relied on an adverse inference drawn from Mautino's declaration that he would assert his fifth amendment right against self-incrimination if subpoenaed. Accordingly, the Board's decision finding that Cooke failed to meet his burden in demonstrating that the Committee's expenditures to Spring Valley City Bank for travel expenses violated section 9-8.10(a)(2) was not clearly erroneous. We affirm the Board's finding.

¶ 88                           Section 9-8.10(b)

¶ 89        Finally, we consider the next steps due to our determination that the Committee violated section 9-8.10(a)(9). We remand the matter to the Board to address whether, pursuant to section 9-8.10(b), the violations were knowingly made and thus whether a fine may be levied. See 10 ILCS 5/9-8.10(b) (West 2016) (providing that "[t]he Board may levy a fine on any person who knowingly makes expenditures in violation of this Section" and that "[t]he Board may act under this subsection only upon the affirmative vote of at least 5 of its members"). Cooke agrees with this course of action, and the Committee raises no arguments to the contrary.

¶ 90                           CONCLUSION

¶ 91        By its plain language, section 9-8.10(a)(9) does not permit committees to make expenditures for gas and repairs to vehicles that are not owned or leased by the committee. For such vehicles, a committee may only make expenditures for actual mileage reimbursement. Because the Committee made expenditures for gas and repairs for vehicles it neither owned nor leased, the Committee violated section 9-8.10(a)(9), and the Board's finding to the contrary was clearly erroneous and is reversed. Section 9-8.10(a)(2) regulates only the amount or price of an expenditure. Based on insufficient evidence, Cooke did not demonstrate that the Committee violated section 9-8.10(a)(2). Therefore, we affirm the Board's decision declining to find a violation of section 9-8.10(a)(2). In light of our conclusion that the Committee violated section 9-8.10(a)(9), we remand the cause to the Board for a

determination of whether the Committee's violation thereof was knowing pursuant to section 9-8.10(b).

¶ 92        Board decision affirmed in part and reversed in part.

¶ 93        Cause remanded with directions.

¶ 94        JUSTICES NEVILLE and CARTER took no part in the consideration or decision of this case.